J-S70037-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.C., IV | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 712 MDA 2017 |

Appeal from the Decree March 24, 2017
In the Court of Common Pleas of Luzerne County
Orphans' Court at No(s):  A-8497

BEFORE:  GANTMAN, P.J., SHOGAN, J., and OTT, J.

MEMORANDUM BY OTT, J.:                    **FILED MAY 15, 2018**

A.C., IV, ("Father") appeals from the March 24, 2017 decree in the Court of Common Pleas of Luzerne County involuntarily terminating his parental rights to his daughter, B.C. ("Child"), born in January of 2006.[1]  Upon review, we affirm.

On November 3, 2016, Luzerne County Children and Youth Services ("CYS") filed a petition for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).  By order the same date, the orphans' court appointed counsel to represent Father, and

---

[1] M.J.F. a/k/a M.J.S. ("Mother") voluntarily relinquished her parental rights, and the court issued a decree to that effect on March 13, 2017.  Mother did not file a notice of appeal, and she is not a party to this appeal.

it appointed Paul Delaney, Esquire, to represent Child as her Guardian A*d Litem* ("GAL") and legal counsel.[2]  The hearing on the petition occurred on March 3, 2017, at which time Child was eleven years old.  Prior to the testimonial evidence, CYS's counsel made a motion in open court to amend its petition by requesting termination under Section 2511(a)(1) and (b) only.  N.T., 3/3/17, at 5.  Neither Father's counsel nor Attorney Delaney objected.

_____

[2] At the commencement of the subject proceedings, Attorney Delaney introduced himself to the court as Child's court appointed GAL in the adoption and dependency matters.  **See** N.T., 3/3/17, at 3.  This Court has recently held that we will address *sua sponte* the failure of an orphans' court to appoint counsel pursuant to 23 Pa.C.S. § 2313(a).  **See In re K.J.H.**, 2018 PA Super 37 *2 (Pa. Super. filed February 20, 2018).  Our Supreme Court, in **In re Adoption of L.B.M.**, 161 A.3d 172 (Pa. 2017) (plurality), held that Section 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding.  The Court defined a child's legal interest as synonymous with his or her preferred outcome.  With respect to this Court's holding in **In re K.M.**, 53 A.3d 781 (Pa. Super. 2012), that a GAL who is an attorney may act as counsel pursuant to Section 2313(a) so long as the dual roles do not create a conflict between the child's best interest and legal interest, the **L.B.M.** Court did not overrule it.

In this case, the orphans' court appointed Attorney Delaney to represent Child as her GAL and legal counsel in the November 3, 2016 order.  Further, the order provided, "Said attorney shall make an immediate determination if a conflict of interest exists between these two roles and, if it is determined, then said attorney shall petition this [c]ourt within ten (10) days of this [o]rder, seeking appointment of a separate Guardian Ad Litem for the minor child."  Order, 11/3/16.  Attorney Delaney did not seek the appointment of a separate GAL.  Likewise, our review of the record, discussed *infra*, reveals there is no conflict between Child's legal and best interests.  Therefore, we do not remand this matter.  **Cf. In re T.M.L.M.**, 2018 PA Super 87 (filed April 13, 2018) (remand for further proceedings when six-year-old child's preference was equivocal and the attorney neglected to interview the child to determine whether legal and best interest were in conflict).

*Id.* The court granted CYS's motion and amended the involuntary termination petition accordingly. *Id.* at 5-6.

DHS presented the testimony of its caseworker, Lynn Lesh, and Father testified on his own behalf. The testimonial evidence revealed that Child was removed from Mother on March 27, 2015, when she was nine years old. N.T., 3/3/17, at 7. Father was last involved with Child when she was one and a half years old. *Id.* at 12. Father was incarcerated at the time of her placement.[3] *Id.* at 24-25. Father wrote one letter to Child on November 19, 2015, pursuant to a court order, but he never contacted Child again during her placement or inquired of CYS as to her well-being. *Id.* at 8-12.

Child resides in kinship care with her step-grandparents, whom she has known since she was two years old, the approximate time when Mother married their son. *Id.* at 50. Child has considered them her grandparents since that time. *Id.* Ms. Lesh testified on direct examination that Child "has voiced to me several times when I meet with her that she just wants to be adopted and have a better life with her grandma and grandpa than she's had because she did not have a good life growing up." *Id.* at 55. Child is

---

[3] At the time of the termination hearing, Father was serving a sentence at State Correctional Institution Forest for crimes that Father testified involved theft. N.T., 3/3/17, at 31-32. The certified record does not include the date or length of Father's sentence. Ms. Lesh testified that Father would be eligible for parole in 2019. *Id.* at 25.

diagnosed with Post Traumatic Stress Disorder ("PTSD") for reasons not specified in the record, and she receives counseling. *Id.* at 14.

By decree dated March 13, 2017, and filed on March 24, 2017, the orphans' court involuntarily terminated Father's parental rights. Thereafter, on April 20, 2017, the court appointed new counsel, Keith Hunter, Esquire, to represent Father. On April 24, 2017, Father, through counsel, filed a timely notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed its Rule 1925(a) opinion on May 24, 2017.

On August 29, 2017, Attorney Hunter filed a petition for leave to withdraw as counsel and an *Anders* brief. A panel of this Court denied counsel's petition for leave to withdraw and remanded the case. *See In the Interest of B.C.*, 712 MDA 2017 (Pa. Super. Dec. 28, 2017) (unpublished memorandum). On remand, this Court directed the orphans' court to either appoint new counsel or direct Attorney Hunter to continue on the case. We also directed the court to issue an order directing Father's counsel to file a Rule 1925(b) statement that properly preserved all issues to be raised before this Court.

As such, on January 4, 2018, the court appointed new counsel for Father. On January 9, 2018, new counsel filed in the orphans' court a petition for leave to withdraw, due to a conflict of interest. On that same date, January 9, 2018, the court granted counsel's petition to withdraw and appointed

Robert Kobilinski, Esquire, as counsel for Father. Further, the court directed Attorney Kobilinski to file a Rule 1925(b) statement within ten days of the date of the order. Attorney Kobilinski filed the required statement on January 31, 2018,[4] wherein he raises one issue concerning 23 Pa.C.S.A. § 2511(a)(1). On February 6, 2018, the orphans' court filed a supplemental Rule 1925(a) opinion in which it incorporates its May 24, 2017 opinion.

Father raises one issue for our review:

A.    Whether the [t]rial [c]ourt abused its discretion, committed an error of law, and/or there was insufficient evidentiary support for the [c]ourt's decision in terminating [Father's] parental rights with regard to the Adoption Act of 1980, specifically Section 2511(a)(1) and 2511(b)?

Father's brief at 3.

We review Father's issue according to the following standard.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial

_____

[4] The order directing counsel to file a Rule 1925(b) statement within ten days was not entered on the docket pursuant to Rule 108(b), providing that "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)." Pa.R.A.P. 108(b). Therefore, Father's untimely filing of the Rule 1925(b) statement does not result in waiver of the issue raised. *See Forest Highlands Community Ass'n v. Hammer*, 879 A.2d 223, 227 (Pa. Super. 2005) (stating that, if any one of the procedural steps set forth in Pa.R.C.P. 236 is missing, the appellant's failure to comply with Pa.R.A.P. 1925(b) will not result in waiver of the issues raised).

court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, the orphans' court terminated Father's parental rights pursuant to Section 2511(a)(1) and (b), which provide as follows:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

This Court has stated, with respect to Section 2511(a)(1), that "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citing *In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006)). We have explained,

The court should consider the entire background of the case and not simply:

. . . mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his . . . parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re A.S.*, 11 A.3d 473, 482 (Pa. Super. 2010) (citations omitted). Further,

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between

- 7 -

parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, *supra* (quoting *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998)).

In *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), our Supreme Court discussed *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975), a case wherein the Court considered the issue of the termination of parental rights of incarcerated persons involving abandonment, which is currently codified at Section 2511(a)(1). The *S.P.* Court stated:

> Applying in *McCray* the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." *Id.* at 655. We observed that the father's incarceration made his performance of this duty "more difficult." *Id.*

*In re Adoption of S.P.*, 47 A.3d at 828. The *S.P.* Court continued:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. *Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child.* Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.
>
> [*McCray*] at 655 (footnotes and internal quotation marks omitted). . . .

*In re Adoption of S.P.*, *supra* (emphasis added); *see also In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (internal citations omitted) (stating that

- 8 -

a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child").

With respect to Section 2511(b), this Court has explained that the requisite inquiry into the "needs and welfare" of the child involves intangibles of the parent-child relationship "such as love, comfort, security, and stability. . . ." **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." **Id.** (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." **In re K.Z.S.**, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted). Moreover, we have explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. **In re K.K.R.S.**, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. **See In re T.D.**, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." **In re Adoption of T.B.B.**, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in **In re A.S.**, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

On appeal, Father argues that CYS failed to meet its burden by clear and convincing evidence pursuant to Section 2511(a)(1). Specifically, Father asserts that his parental rights may not be terminated solely because he was incarcerated during the six months immediately preceding the filing of the involuntary termination petition. Moreover, he asserts that he was directed by CYS not to have direct contact with Child. Father's brief at 15. Father continues,

> [H]e was directed by [CYS] to write a letter to his daughter in hopes of reintegrating his Child into his life and re-establishing his father-daughter relationship. He complied with this directive and did write a letter.
>
> . . .
>
> [Father] never then heard back from [CYS] in regards to what his next move was to be.

Father's brief at 15-16. Father baldly asserts, "It should have been [CYS's] responsibility to re-establish [Child's] relationship with her father before settling on placing her with the foster resource permanently." Father's brief at 16-17. Father's claims are meritless.

During the involuntary termination proceeding, Ms. Lesh, the CYS caseworker, testified on direct examination as follows.

Q. Was [Father] afforded visitation with his minor child in this case?

A. In September of 2015, at the disposition hearing, visitation was discussed, and he was ordered to write a letter to [Child] to introduce himself back into her life because he hasn't been part of her life since she was around one half years old.

. . .

Q. And can you tell the [c]ourt whether or not [Father] did . . . write a letter to reintroduce himself to [Child]?

A. He did.  He wrote a letter in November of 2015.  It was dated for November 15, 2015.  The agency received it on November 19[, 2015].  [It] was a letter written to myself and to [Child].  I delivered the letter to [Child] that day to have her read the letter.

N.T., 3/3/17, at 8-9.

On cross-examination by Father's counsel, Ms. Lesh acknowledged that the master's recommendation for disposition[5] stated as follows.

[N]atural father will [write] a letter to the minor child.  This letter will be shared with the [GAL] and the minor child.  If the letter has a negative effect upon the minor child, a referral to individual counseling through Children's Service Center will be made in an attempt to reintroduce the minor child to the natural father through a therapeutic setting.  **The natural father then may petition the [c]ourt to review the visitation issue**.

_____

[5] Father's attorney introduced the master's recommendation for disposition into the record as Exhibit A, which he indicated is dated October 7, 2015. N.T., 3/3/17, at 29.  The orphans' court admitted Exhibit A, but it is not a part of the certified record. *Id.* at 30.

*Id.* at 14-15 (emphasis added). Ms. Lesh explained that CYS made a referral to Children's Service Center, but "it was taking forever for them to make an appointment, so we opted to go to the Friendship House in Scranton. And that is where [Child] still receives her counseling." *Id.* at 15. Ms. Lesh stated that CYS received reports from the Friendship House regarding Child's counseling, which she believed were provided to Father's counsel, but she does not have any documentation from Friendship House that recommended a visit occur between Father and Child at the prison.[6] *Id.* at 16, 20. Importantly, Ms. Lesh testified that Father never petitioned the court for visitation with Child. *Id.* at 9.

Pursuant to the master's recommendation for a permanency review hearing,[7] Ms. Lesh acknowledged on cross-examination by Father's counsel that the master recommended that Child's therapist "shall review if contact with birth father is appropriate, and that determination shall be reduced to writing within 45 days. If an oral report is also given by the therapist, the agency shall advise all parties. If recommended, the agency shall have the authority to start visits." *Id.* at 18-19. Ms. Lesh testified that CYS

---

[6] Father's trial counsel did not represent him during the dependency matter. N.T., 3/3/17, at 16.

[7] Father's attorney introduced this recommendation into the record as Exhibit C, which he indicated is dated October 3, 2016. N.T., 3/3/17, at 29. The orphans' court admitted Exhibit C, but it is not a part of the certified record. *Id.* at 30.

subsequently received a report from Child's therapist, on a date unspecified in the record, which stated as follows.

> Within this time span, [Child] has shown notable determination and compliance with working towards therapeutic goals and processing emotions towards her natural mother and father.
>
> It is our hope that [Child] will continue to progress through past experiences [and] autonomously utilize therapeutic tools beyond Friendship House.
>
> That's all they have written.

*Id.* at 20. She continued on cross-examination:

> Q. Now, anywhere in that letter, does it make any recommendation that the therapist is recommending a visit between [Father] and his child?
>
> A. No.

*Id.* at 20.

Based on the foregoing, we conclude that there is no record evidence that CYS directed Father not to have direct contact with Child. Rather, Father's counsel cross-examined Ms. Lesh about the disposition order requiring Father to write a letter to Child, which also expressly permitted him to petition the court for visitation with Child. Father wrote a letter to Child on November 19, 2015, when she was nine years old, but he never again contacted her up to and including the time of the termination hearing on March 3, 2017, when she was eleven years old, nor did he petition the court for visitation. In addition, the orphans' court found as follows, which Ms. Lesh's testimony supports:

> Despite Father's rationale, communicating with the child directly is only one method of performing parental duties for the child.

> There are many other methods through which the Father could have cared for the child. Father knew how to contact the caseworker. He never asked the caseworker how the child was doing even when he had the opportunity to speak directly to the caseworker in person on two occasions. Furthermore, . . . Father did not send any cards or letters for the child's birthdays or holidays. He did not send any financial support. He did not telephone the caseworker and inquire on how his child was doing. He never performed any parental duties except to write one letter to the child in November of 2015.

Trial Court Opinion, 5/24/17, at 7; **see also** N.T., 3/3/17, at 10-12; 26-28.

Thus, we reject Father's claim that the court involuntarily terminated his parental rights solely because he was incarcerated during the six months immediately preceding the filing of the termination petition.

To the extent that Father asserts his conduct does not warrant termination because CYS "did not take any steps to reintroduce" Child to him, his assertion is misplaced. **See** Father's brief at 16. In **In the Interest of D.C.D.**, 105 A.3d 662, 671 (Pa. 2014) our Supreme Court rejected this Court's holding that "Section 2511 of the Adoption Act, when read in conjunction with Section 6351 of the Juvenile Act, requires that an agency must provide a parent with reasonable efforts aimed at reunifying the parent with his or her children prior to petitioning for termination of parental rights and that termination cannot be granted absent the provision of reasonable efforts." Rather, the **D.C.D.** Court held that nothing in Section 6351 of the Juvenile Act "forbids the granting of a petition to terminate parental rights, under Section 2511, as a consequence of the agency's failure to provide reasonable efforts to a parent." **Id.** at 675. In any event, the foregoing testimonial evidence

demonstrates that CYS provided reasonable efforts to reunify Father with Child by referring Child to Friendship House for counseling and receiving reports from Child's therapist, none of which recommended that Child visit with Father in prison.

The record evidence supports the orphans' court's conclusion that Father's conduct warranted termination pursuant to Section 2511(a)(1) in that he failed to perform his parental duties during the twenty months between her placement and the filing of the termination petition. In fact, other than the letter he wrote to Child in November of 2015, there is no record evidence that Father had any contact with Child since she was one and a half years old, far in excess of the statutory six-month minimum.

In his Rule 1925(b) statement, Father did not assert an error with respect to Section 2511(b). **See Dietrich v. Dietrich**, 923 A.2d 461, 463 (Pa. Super. 2007) (stating that when an appellant filed a Rule 1925(b) statement, any issues not raised in that statement are waived on appeal). However, based on the statutorily required bifurcated analysis in termination cases, we review the decree pursuant to Section 2511(b).

Our Supreme Court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **In re T.S.M.**, **supra** at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking

clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In his brief, Father baldly asserts that the court abused its discretion in terminating his parental rights pursuant to Section 2511(b) because CYS did not reintegrate Child into his life. *See* Father's brief at 19-20. Father's claim is misplaced based on our Supreme Court's holding in *D.C.D.*, *supra* at 672, that neither Section 2511(a) nor (b) "requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights." Therefore, Father's claim fails.

The testimonial evidence supports the court's conclusion that terminating Father's parental rights would serve Child's needs and welfare pursuant to Section 2511(b). Ms. Lesh testified that no bond exists between Child and Father. N.T., 3/3/17, at 52. On cross-examination by Father's counsel, Ms. Lesh testified:

> Q. What was [Child's] reaction to the letter [from Father], if you were present for the reading of it?
>
> A. I was there. [Child] read the letter, and she didn't really have any emotion or reaction to it other than that she doesn't really remember [Father]. She stated that the person that she remembers as her father growing up was her stepfather. That's who she called dad, and that she did not want to write back to [Father].

*Id.* at 13.  Ms. Lesh testified that a bond exists between Child and her kinship care parents, who are a pre-adoptive resource.  *Id.* at 51-53.  She testified that Child wishes to be adopted.  *Id.* at 55.  As such, Ms. Lesh testified that Child would not suffer any detrimental effects if Father's parental rights are terminated.  *Id.* at 54-55.  Accordingly, we affirm the decree pursuant to Section 2511(a)(1) and (b).

Decree affirmed.

Judge Shogan joins the memorandum.

President Judge Gantman concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/15/18